MAKAR, J.
This case involves the statutory authority of the State of Florida, through its regulatory agents, to intervene and act as receiver over an insolvent continuing care retirement community (CCRC) for the benefit of its residents. We reverse the order below, holding the State is without this authority under the circumstances of this case.
I
Since the advent of CCRCs in the 1980s, the State of Florida has taken an active regulatory approach to ensure that residents of these facilities — who expend substantial monies for having health care, nursing, and assisted living services under one roof — are protected from potential scams and the economic vicissitudes of the industry as it established itself and evolved.[1] The legislature created, and later revised, the regulatory structure that oversees the providers of CCRCs and their relationships to their residents, which is primarily contained in Chapter 651, Florida Statutes, with other relevant provisions in Chapter 631 and elsewhere.[2] Although contracts to purchase interests in CCRCs are not “insurance” products in the ordinary meaning of that term, the statutory framework is placed under the auspices of insurance regulation and regulators.[3] The *1062 oversight and regulatory functions mirror those for insurers, with important exceptions, but also have a strong consumer protection component to safeguard the interests of residents.[4]
As a part of this regime, the Department of Financial Services (DFS) and the Office of Insurance Regulation (OIR) play key roles.[5] Section 651.114, entitled “Delinquency proceedings; remedial rights,” sets forth the authority of OIR to seek remedial relief. Subsection 651.114(5) provides that:
(5)Should the [OIR] find that sufficient grounds exist for rehabilitation, liquidation, conservation, reorganization, seizure, or summary proceedings of an insurer as set forth in ss. 681.051, 631.061, and 631.071, the [OIR] may petition for an appropriate court order or may pursue such other relief as is afforded in part I of chapter 631. Before invoking its powers under part I of chapter 631, the office shall notify the chair of the advisory council.
Subsection (6) provides that OIR and DFS may intervene “with all the necessary powers and duties” they possess “under the provisions of part I of chapter 631 in regard to delinquency proceedings of insurance companies.” Id. § 651.114(6). These powers provide for an active interventionist approach where CCRCs are in financial distress and immediate corrective action is warranted; OIR may also choose to take an incrementalist approach by requiring or specifying corrective plans with which providers must comply.[6]
Section 631.051, referred to above in subsection 651.114(5), sets forth the powers of DFS to rehabilitate an insurer.
Grounds for rehabilitation; domestic insurers. — The [DFS] may petition for an order directing it to rehabilitate a domestic insurer or an alien insurer domiciled in this state on any one or more of the following grounds, that the insurer:
(1) Is impaired or insolvent;
[[Image here]]
(3) Is found by the [OIR] to be in such condition or is using or has been subject to such methods or practices in the conduct of its business, as to render its further transaction of insurance present *1063 ly or prospectively hazardous to its policyholders, creditors, stockholders, or the public;
§ 631.051(1), (3). Based upon findings by OIR that an insurer is insolvent or that further transaction of its business is hazardous (or potentially so), the DFS may seek to rehabilitate the insurer under this section.
A countervailing statutory provision— relevant in this appeal — is section 651.114(8)(a), which carves out circumstances where OIR, and by implication DFS, must suspend its exercise of statutory powers when certain requirements related to trustees or lenders are met. Id. § 651.114(8)(a). Subsection (8)(a) subordinates the offices broad remedial rights to the rights of a lender[7] if the terms of an instrument used to finance a facility include the lender’s agreement that it will honor the rights of CCRC residents under their at-home contracts; the lender must also provide assurance that residents’ rights will “not be disturbed by a foreclosure or conveyance in lieu thereof,” provided residents meet certain requirement (such as paying their contractual obligations, complying with their contracts, and asserting no claims that are inconsistent with the lender’s rights).[8] Id. § 651.114(8)(a)(l)-(3).
During the suspension of its remedial rights, OIR has the ability to take action to revive its powers to protect residents. Subsection (8)(c) provides that “at any time during the suspension of its remedial rights as provided in paragraph (a)” the OIR may “determine” that a lender “is not in compliance with paragraph (a)[.]”[9] In this event, OIR must notify the lender “in writing of its determination, setting forth the reasons giving rise to the determination and specifying those remedial rights afforded to the office which the office shall then reinstate.” Id. § 651.114(8)(c). The regulatory statute, in essence, has a “suspension clause” in subsection 8(a) that overrides OIR’s remedial powers, and a statutory “revival clause” in subsection 8(c) that operates to restore such powers. How these two clauses interact decides this case.
II
Devonshire at PGA National, Chatworth at PGA National LLC, and Chatworth PGA Properties LLC (collectively Devon-shire) own and operate a CCRC in Palm Beach Gardens, Florida, comprising 327 independent living apartments, 71 skilled nursing beds, 22 assisted living units, and 20 memory care beds. It currently has approximately 385 residents.
*1064 On May 1, 2007, Devonshire and Merrill Lynch Capital (Lender) entered a Credit and Security Agreement (Agreement) by which Devonshire obtained a mortgage loan of $161.6 million. The Agreement required interest-only payments until April 30, 2012, when the principal balance became due. Lender retained the right to foreclosure on the property should Devon-shire default. Soon after the principal balance became due, Devonshire defaulted on the mortgage due to a lack of sufficient assets to make full payment.
On May 7, 2012, the Lender served Devonshire with a Notice of Default and demanded immediate payment, reserving the right to commence foreclosure proceedings and the appointment of a receiver. The Lender’s attorneys also emailed the OIR to say that “although the Lenders intend to take all necessary and appropriate actions to protect their interests with respect to the collateral for the loans they hold, they will take no action inconsistent with the loan documents or the requirements of Chapter 651, Florida Statutes.”
Immediately after the payment date had passed, on May 3, 2012, OIR referred Devonshire to DFS due to its finding that Devonshire “is insolvent or is about to become insolvent” because it “will not have sufficient assets to pay off all outstanding obligations.” OIR also concluded that Devonshire’s further operation is “presently or prospectively hazardous to its residents, policyholders, creditors, stockholders, or the public” and “poses a serious danger to [their] financial safety[.]” OIR recommended that DFS initiate delinquency proceedings and petition for receivership. By law, a “delinquency proceeding pursuant to [Chapter 631] constitutes the sole and exclusive method of liquidating, rehabilitating, reorganizing, or conserving an insurer.” § 631.021(3), Fla. Stat. (2011).
On May 14, 2012, DFS applied for a show cause order as well as an injunction and notice of automatic stay for purposes of rehabilitation, which the trial court collectively granted on May 31, 2012. It found that: DFS made a pri-ma facie showing for its appointment as receiver; Devonshire defaulted on the loan and failed to submit a plan to repay the loan, or to refinance or extend the loan; Devonshire’s liabilities exceed its assets; Devonshire is insolvent or about to become insolvent; and Devon-shire’s continued operation was hazardous to its residents, creditors, policyholders, stockholders, or the public.
On July 2, 2012, Devonshire responded by challenging: OIR’s authority to refer Devonshire to DFS under section 651.114(8); Devonshire’s status as insolvent under 651.011(8); and OIR’s conclusion that Devonshire’s continued operation would be hazardous. DFS replied on July 6, 2012, contesting Devonshire’s arguments and claiming Devonshire lacked standing to rely on section 651.114(8).
On July 9, 2012, the circuit court held an evidentiary hearing. It was shown that— other than its default on the $158.2 million mortgage loan — Devonshire had been meeting its other financial obligations and paying expenses as they were due (such as payroll, utilities, and vendors); these operating expenses amount to about $27 million annually. About 8% of the residents had contracts with Devonshire providing for substantial refunds if they elected to leave. Residents were told of the mortgage default and the pending proceedings, but none had left as of the time of the hearing; no interruptions in services had occurred either. Devonshire’s negotiations with the Lender have been unsuccessful; it has made no payments on the mortgage since the time of default.
*1065 The trial court found Devonshire insolvent and decided to err on the side of caution with regard to the residents because in the event “things go wrong for some reason, then there is a real risk.” It also noted that OIR had found Devonshire “to be in such condition as to render its further transaction of insurance hazardous to its residents!.]” The court expressly found that “[t]here is clearly no artifice, scheme or anything improper at this point in time.... ” The court stayed its order to allow Devonshire to appeal, which it has done; it also granted an automatic stay under section 631.041(1), Florida Statutes with specified conditions.
Ill
The two primary issues presented are (A) whether Devonshire is “insolvent” within the meaning of section 651.011(8), Florida Statutes, and (B) whether OIR and DFS have statutory authority to act against Devonshire under the circumstances despite the exemption in section 651.114(8), Florida Statutes. We agree with the trial court’s conclusion that Devonshire is insolvent as defined in section 651.011(8); we disagree that OIR and DFS have the authority to act under the circumstances due to the exemption in section 651.114(8)(a), but recognize that they may do so upon a showing by OIR that the interests of the residents warrant intervention under section 651.114(8)(c).
A. Insolvency
As a threshold matter, Devonshire argues that it is not insolvent within the meaning of section 651.011(8), which defines “insolvency” to mean “the condition in which the provider is unable to pay its obligations as they come due in the normal course of business.” § 651.011(8), Fla. Stat. (emphasis added).[10] The word “obligations” is highlighted because it is the focus of Devonshire’s argument, which is that the statutory definition requires a default on more than one obligation (i.e., “obligations”). Because Devonshire is in default on only its financial obligation to the Lender — and up-to-date on all other financial obligations — it cannot be deemed insolvent under Chapter 651. Punctuating this argument, Devonshire urges that “similar language” in the bankruptcy code supports its view because the code speaks in terms of a debtor “generally not paying its debts.” See 11 U.S.C. § 303(h)(1).
DFS counters that the federal code has no definition of “insolvency;” instead, it is the language of section 651.011(8), not that of the bankruptcy code, that is relevant. DFS also questions the sensibility of construing “insolvency” to include a provider who defaults on two or more small debts but exclude a provider who defaults on a single multi-million dollar debt.
We conclude that the legislature did not intend the construction that Devonshire advances. To be sure, the statutory definition in section 651.011(8) uses the word “obligations”; but this use of the plural (versus the singular) is of no moment under the Florida Statutes, which in its very first section states:
1.01 Definitions. — In construing these statutes and each and every word, phrase, or part hereof, where the context will permit:
(1) The singular includes the plural and vice versa.
*1066 § 1.01(1), Fla. Stat. (2012). In this context, we find the legislature’s use of the plural was not intended to exclude the singular; it would be a very odd result otherwise. We find it difficult to imagine that the legislature intended that DFS and OIR be powerless where a provider defaults on a single massive debt. See Bd. of Pub. Instruction of Broward Cnty. v. Doran, 224 So.2d 693, 699 (Fla.1969) (statute providing for issuance of injunctions upon application by “citizens” applies to one citizen as well; applying § 1.01(1), Fla. Stat.). Because we find no fault in the trial court’s determination as to Devonshire’s insolvency, we move on to the next argument.
B. Section 651.114(8)’s Exemption
Devonshire argues that DFS has no authority to act because the Lender has included language in the loan documents that specifies that the Lender will protect residents as specified in the statutory suspension clause. It argues that the language of section 651.114(8)(a) “demonstrates that it was intended to permit a mortgage foreclosure to go forward, without the initiation of a delinquency proceeding, as long as during the foreclosure process the rights of the residents are being honored.” DFS contrarily argues that section 651.114(8) “is applicable only when a lender has taken possession of a CCRC through the foreclosure process.”[11]
As a part of its Agreement with Devon-shire, the Lender included the following language:
Section 11.10 Resident Rights. Pursuant to Section 651.114, Florida Statutes, the Administrative Agent and Lenders agree that the rights of each resident of the Project under the resident’s Residential Agreement will be honored and will not be disturbed by a foreclosure under the Financing Documents or a conveyance in lieu thereof as long as the resident (a) is current in the payment of all monetary obligations required by Resident Agreement, (b) is in compliance and continues to comply with all of the resident’s Resident Agreement, and (c) has asserted no claim inconsistent with the rights of the Administrative Agent or Lenders.
Devonshire argues that the inclusion of this language in the Agreement operates to suspend the remedial powers of OIR (and DFS) over Devonshire unless it is shown that the interests of residents are not being adequately protected as defined in the section 651.114(8)(c). We agree.
*1067 The “inclusion” of the language in section 11.10 of the Agreement satisfies the literal language of subsection (8)(a), which states that the OIR’s powers are subordinated if a lender “by inclusion or by amendment to the loan documents ... agrees that the rights of residents under a continuing care or continuing care at-home contract will be honored and will not be disturbed by a foreclosure or conveyance in lieu thereof’ (provided residents abide by certain conditions not relevant here). § 651.114(8)(a). The Lender has done so here, using language that closely tracks the statute.
As noted earlier, the Lender also communicated with OIR via an email stating that it will “take no action inconsistent with the loan documents or the requirements of Chapter 651, Florida Statutes,” referring to Agreement Section 11.10’s protection of resident’s rights. The statute provides that a lender can extend protection for residents “by a separate contract with the office”; but it is not argued that this email amounts to a “separate contract” within the meaning of the statute. Nonetheless, the email bolsters the point that the Lender recognized and explicitly understood its ongoing obligations under section 11.10 of the Agreement to protect residents.
One might be apprehensive that the mere inclusion in the loan document of rote statutory language from subsection (8)(a) can short-circuit the broad remedial powers of DFS and OIR under the circumstances. But that is what the statute says; we are not in a position to second-guess the legislature on the matter. Having “by inclusion” inserted its written assurance in the “loan documents” that it will honor and protect the CCRC contracts at issue, the Lender has done all the legislature has required to suspend the powers of DFS and OIR under the statute.
That does not end the story. We note that what the legislature took away in one breath it revitalized in the next. Subsection (8)(c) provides:
(c) Should the office determine, at any time during the suspension of its remedial rights as provided in paragraph (a), that the trustee or lender is not in compliance with paragraph (a), or that a lender or trustee has assigned or has agreed to assign all or a portion of a delinquent or defaulted loan to a third party without the office’s written consent, the office shall notify the trustee or lender in writing of its determination, setting forth the reasons giving rise to the determination and specifying those remedial rights afforded to the office which the office shall then reinstate.
§ -651.114(8)(c) (emphasis added). We read this language as the means by which OIR and DFS may, even during the suspension period, determine that intervention is necessary, to reinstate and assert their remedial rights. ■ The highlighted portion makes clear that the OIR may act “at any time” during the suspension period if it makes a justifiable determination that a lender (or trustee) is not complying with the statute.
This revival clause in subsection (8)(c) does not make subsection 8(a) a paper tiger; the suspension of the remedial rights of OIR and DFS allows a lender (who typically is the most financially exposed overall) to ensure the continued operation of the CCRC and the protection of residents without the complications that direct government intervention and control can engender. It prpvides breathing space, if only temporarily, to see whether the facility can be operationally salvaged and the debt reworked (and bankruptcy *1068 avoided).[12] If they cannot, and OIR makes a factually supportable determination at any time that the statutory requirements of subsection (8)(a) are unmet, government intervention is permissible.
In this case, no evidence was presented that Devonshire was not making payment on all the operational aspects of the CCRCs it oversees. It was meeting its financial obligations and paying expenses such as payroll, utilities, and vendors, as they came due, amounting to about $27 million annually. Residents know of the mortgage default and this proceeding, but none has left (at least as of the time of the hearing); no interruptions in services to residents had occurred (again, as of the time of the hearing). Devonshire, though unable to make the balloon mortgage payment, had been able to “make ends meet” operationally; it had about $8 million unrestricted cash, about $8.6 million in restricted liquid reserve, and hoped to renegotiate the loan. Admittedly, the inability to make the multi-million dollar lump sum payment is troubling; but if OIR and DFS have evidence that the rights of residents are not being honored, nothing prevents intervention upon a proper showing under the revival clause in section 651.114(8)(c).
Finally, DFS reads the statute to only apply when a lender has actually taken control of a facility through a foreclosure, which has not occurred. But it is only subsection (8)(d) — in one long sentence— that speaks in terms of a completed acquisition of a facility by a lender:
(d) Upon acquisition of a facility by a trustee or lender and evidence satisfactory to the office that the requirements of paragraph (a) have been met, the [OIR] shall issue a 90-day temporary certificate of authority granting the trustee or lender the authority to engage in the business of providing continuing care or continuing care at-home and to issue continuing care or continuing care at-home contracts subject to the [OIR’s] right to immediately suspend or revoke the temporary certificate of authority if the [OIR] determines that any of the grounds described in s. 651.106 apply to the trustee or lender or that the terms of the contract used as the basis for the issuance of the temporary certificate of authority by the [OIR] have not been or are not being met by the trustee or lender since the date of acquisition.
§ 651.114(8)(d) (emphasis added). Other portions of subsection (8) relate to contingencies that are independent of a successful foreclosure process. See §§ 651.114(7) (likely future insolvency); (8)(c) (assignment of delinquent loan). Because the statute is not limited solely to post-foreclosure matters, we cannot read the regulatory structure as DFS has urged.
[[Image here]]
In conclusion, we hold that the trial court was correct in concluding that Devonshire met the statutory definition of “insolvency” but erred in entering an injunction under the circumstances of this case due to the statutory exception in section 651.114(8)(a). We remand with directions to vacate the injunction.
LEWIS, and WETHERELL, JJ., concur.

.See Nancy A. Peterman, Robert W. Lannan, & John T. Gregg, Protecting Residents Of Continuing Care Retirement Communities, 22 Am. Bankr.Inst. J. 18, March 2003, at 18 (noting that "[s]everal state legislatures have responded to the financial risks associated with CCRCs by attempting to enact legislation aimed at protecting residents.”). See also Michael D. Floyd, Should Government Regulate the Financial Management of Continuing Care Retirement Communities?, 1 Elder L.J. 29, 32 (1993) (discussing rationales for regulatory intervention including "past instances of fraud and mismanagement that led to financial failures by CCRCs” as well as protection of the elderly "due to the complexity of CCRC contracts and the large, long-term financial commitment that a CCRC resident must make.”).

. See generally Gregory K. West, Frank M. Mock & Ronald R. Shuck, Florida's Administrative Supervision Statute: Its Impact on Continuing Care Communities, 66 Fla. Bar J. 23 (April 1992).

. Florida’s regulatory approach appears to be among the more aggressive that' states have adopted. See Nathalie D. Martin, The Insolvent Life Care Provider: Who Leads the Dance *1062 Between the Federal Bankruptcy Code and State Continuing-Care Statutes?, 61 Ohio St. LJ. 267, 315 (2000) ("Various states have attempted to create rehabilitative powers in a commissioner or other person or department in charge of [continuing care facilities] in that state.”) (noting that "[m]any of these provisions are unenforceable because they purport to give the state, rather than the bankruptcy court, power over both state insolvencies and bankruptcies.”); see also Katherine C. Pearson, Continuing Care Retirement Communities, State Regulation and the Growing Importance of Counsel For Residents and Their Families, 77 Pa. B. Ass’n Q. 172 (2006) (non-exhaustive review of state regulatory approaches).

.See generally Peterman, et al., supra, at 18-19 (discussing fraud and mismanagement of CCRCs during early years of the industry’s development).

. Section 651.015, Florida Statutes (2012), states that the "administration of this chapter is vested in the commission, office, and department” as identified in the chapter. We refer to OIR and DFS separately where necessary, but generally refer to DFS because it is the only appellee in this case.

. Subsection (7) provides: "If the financial condition of the continuing care facility or provider is such that, if not modified or corrected, its continued operation would result in insolvency, the [OIR] may direct the provider to formulate and file with the [OIR] a corrective action plan. If the provider fails to submit a plan within 30 days after the [OIR’s] directive or submits a plan that is insufficient to correct the condition, the [OIR] may specify a plan and direct the provider to implement the plan.” Id. § 651.114(7).

. The statute applies equally to a “trustee or lender”; we refer only to the "lender” because no trustee is involved in this case.

. Subsection (b) provides that a lender (or trustee) is not required to do the following:
1. Continue to engage in the marketing or resale of new continuing care or continuing care at-home contracts;
2. Pay any rebate of entrance fees as may be required by a resident’s continuing care or continuing care at-home contract as of the date of acquisition of the facility by the trustee or lender and until expiration of the period described in paragraph (d);
3. Be responsible for any act or omission of any owner or operator of the facility arising before the acquisition of the facility by the trustee or lender; or
4.Provide services to the residents to the extent that the trustee or lender would be required to advance or expend funds that have not been designated or set aside for such purposes.
§ 651.114(8)(b).

.This section also applies when OIR determines “a lender or trustee has assigned or has agreed to assign all or a portion of a delinquent or defaulted loan to a third party without the [OIR’s] written consent[.]” § 651.114(8)(c).

. The parties agree this section applies, rather than the definition of "insolvency" in Chapter 631, which in relevant part, is defined as "all the assets of the insurer, if made immediately available, would not be sufficient to discharge all its liabilities or that the insurer is unable to pay its debts as they become due in the usual course of business.” § 631.011(14).

. DFS also argues that Devonshire has no standing to invoke section 651.114(8)(a) whose exemption was intended to benefit lenders and trustees, not CCRC providers. We have no quibble with the purpose of the exemption, which has this general purpose in mind. We find no impediment on standing grounds, however, with a provider (who is subject to a regulatory injunction and receivership proceeding) arguing that the exemption should apply. Here, Devonshire is directly impacted by the injunction and adversely affected by its terms, thereby establishing its ability to argue in favor of the statutory exception’s application. Nedeau v. Gallagher, 851 So.2d 214, 215-16 (Fla. 1st DCA 2003). We do not construe section 651.114(8)(a) as a remedial provision, which would limit the class of persons entitled to invoke its proscriptions to those intended to be protected. See Times Publ’g Co. v. A.J., 626 So.2d 1314, 1315-16 (Fla. 1993) (limiting standing to assert privacy provisions to those the legislature intended to protect because statute was remedial in nature). Instead, we read the subsection as a limitation on the authority of OIR to act in the circumstances described by the legislature. Any proper party may challenge OIR's actions in contravention of an express limitation on the exercise of delegated authority. See Sw. Fla. Water Mgmt. Dist. v. Save the Manatee Club, Inc., 773 So.2d 594, 597 (Fla. 1st DCA 2000) (upholding standing of any affected party to challenge a rule as an invalid exercise of delegated legislative authority).

. Tension exists between state regulatory controls over insolvent CCRCs and the federal bankruptcy laws. See Martin, supra, at 315 (noting that state attempts to place rehabilitative powers in state agency may be "unenforceable because they purport to give the state, rather than the bankruptcy court, power over both state insolvencies and bankruptcies.'').